UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 3:14-cr-162(VLB) |
| | : | |
| Jose Rosado | : | |
|     Defendant. | : | February 8, 2021 |

## MEMORANDUM OF DECISION DENYING DEFENDANT JOSE ROSADO'S MOTION FOR A REDUCTION OF SENTENCE, [Dkt. 102]

Before the Court is Defendant Jose Rosado's motion for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkt. 102]. Mr. Rosado seeks a modification of his sentence from incarceration to home confinement based on his asserted risk of severe complications should he become re-infected by COVID-19 while incarcerated at FCI McKean. [*Id.*]. Mr. Rosado's current release date is March 13, 2021. *See Inmate Locator Service, BOP Registration no.* 22342-14-014, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (Feb. 4, 2021). The Government opposes Defendant's motion. [Dkt. 105]. For reasons set forth below, the Court DENIES Defendant's motion.

### Background

I. **Procedural History**

In early 2012, federal agents and local police commenced an investigation into a narcotics-trafficking and money laundering operation headed by Oscar

1

Valentin in New London, Connecticut. [Dkt. 30 (Pre-Sentence Investigation Report) ¶¶ 7-8]("PSR"). During the investigation, Mr. Valentin's brother-in-law, Javier Reyes, was stabbed to death outside of his apartment. PSR ¶ 9. A subsequent investigation by the New London Police Department and the FBI determined that Oscar Valentin hired Nestor Pagan, who in turn, hired Jose Rosado, Jr. and Andrew Aviles to carry out the assault. PSR ¶ 10.[1]  Mr. Rosado agreed to perform a "beat down" for Mr. Pagan for $500, but later sought and was promised $1,200. PSR ¶ 20.

After arrangements were made, an associate drove Mr. Rosado, Mr. Aviles, and Mr. Pagan to the victim's apartment building. Mr. Rosado was armed with a baseball bat and a gun and Mr. Aviles was armed with a knife. PSR ¶¶ 11-13. Mr. Rosado and Mr. Aviles lied in wait; once Mr. Reyes stepped out of his apartment to smoke a cigarette, Mr. Rosado struck Mr. Reyes with a baseball bat and Mr. Aviles stabbed him multiple times as he fought for his life. PSR ¶ 14. The medical examiner determined that Mr. Reyes died from his stab wounds. PSR ¶ 17.

Mr. Rosado pled guilty to commission of a Violent Crime in Aid of Racketeering, in violation of 18 U.S.C. §§ 1959(a)(3), which carried a potential 20-year term of imprisonment. [Dkt. 23 (Tr. of Plea Hr'g) 17:15-18:10](canvass of Defendant as to his understanding of penalties for the offense and consequences of supervised release violation). Taking all of the 3553(a) sentencing factors into account and in consideration of the entire record and the Defendant's age, the Court departed from the advisory sentencing guidelines and sentenced Mr. Rosado

---

[1] Maaseiyah Williams, also known as "Zayah," was dating Mr. Pagan's sister at the time and helped Pagan by introducing him to Mr. Rosado and Mr. Aviles. PSR ¶ 10.

to a lenient sentence of 60 months imprisonment. [Dkts. 49 (Am. Crim. J.) and 50 (Sealed Statement of Reasons)]. The custodial sentence was to be followed by a three-year term of supervised release, subject to the standard, mandatory, and special conditions of supervised release. [Dkt. 50]. In short, notwithstanding his involvement in a heinous crime, the Court placed its trust in Mr. Rosado and gave him a second chance based on his young age and efforts to make amends.

Unfortunately, Mr. Rosado did not take advantage of this opportunity. Mr. Rosado commenced supervision on May 24, 2018. [Dkt. 51 (Prob. Form. 12b, 01/07/2019)]. The Probation Office sought to modify Mr. Rosado's conditions of supervised release in October 2018 to include a curfew and electronic monitoring because he failed to utilize local job centers to obtain appropriate employment, he hid from police after he was involved in a motor vehicle accident, and tested positive for marijuana and cocaine the following day. *Id*. Mr. Rosado's behavior and his continued pursuit of high-risk social interactions demonstrated a need for further support from the Probation Office and he consented to the proposed modification. *Id*.

After the consent modification, Mr. Rosado tested positive for cocaine again on January 8, March 5, and April 29, 2019, necessitating the issuance of a summons. [Dkt. 52 (Prob. Form. 12c, 05/10/2019)]. The Court held a compliance hearing on May 30, 2019. [Dkt. 57 (Audio of Compliance Hr'g)]. During the compliance hearing, Mr. Rosado confirmed that he understood the Court's warning about the consequences of the social choices that he was making. *Id*.

Mr. Rosado did not heed the Court's warning. Mr. Rosado tested positive

again for cocaine on: August 6, 2019, September 24, 2019, October 1, 2019, and November 15, 2019. [Dkt. 72 (Sealed Am. Violation Report) at 2]. Then, on December 3, 2019, officers with the New London Police Department were called to Mr. Rosado's apartment for a report of screaming and a female crying. *Id.* A resident allowed officers into the apartment. Officers opened the door to Mr. Rosado and his girlfriend's bedroom to perform a caretaker function and ensure there was no one injured inside. *Id.* The closet inside the bedroom was wide open and in plain view was a plastic baggie, tied at one end, containing a white powdery substance consistent with cocaine. *Id.* at 2-3. There were boxes of plastic baggies, as well as a scale, next to the white powdery substance. *Id.* On the floor of the closet there was a small safe and a closed cabinet that was secured with a padlock. *Id.* at 3. Police weighed and tested the substance, which established that the bag contained 12.8 grams of cocaine. *Id.* at 3. During this time, he also discontinued his adult education classes and quit working. *Id.* at 3-4.

On December 4, 2019, Mr. Rosado reported to the Probation Office and met with his supervising officer. *Id.* at 3. He was instructed to report to the Probation Office again on December 16, 2019; however, he failed to report as instructed. *Id.* His whereabouts was unknown until January 22, 2020, when he was arrested by federal agents pursuant to a criminal complaint and warrant lodged in *United States v. Rosado*, 3:19-mj-1669-RMS. *Id.*

On June 26, 2020, Mr. Rosado appeared before the Court and admitted to a violation of Mandatory Condition #1, that is, that he committed another federal, state or local crime. Specifically, he admitted to the conduct charged in the

4

complaint (*United States v. Rosado*, 3:19-mj-1669 (RMS)), that is, that he possessed a quantity of cocaine with intent to distribute it. After Mr. Rosado admitted to the violation, the Government moved to dismiss the new criminal complaint and have the issue of punishment address with respect to the supervised release violation. *Rosado*, 3:19-mj-1669 (RMS), Dkt. 43 (Gov. Am. Mot. to Dismiss). The Government's decision was beneficial to Mr. Rosado because he avoided a second federal conviction and consecutive sentences. *See* U.S.S.G. § 7B1.3(f) (any term of imprisonment imposed upon the revocation of probation or supervised release "shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.").

At sentencing in July 2020, the Court considered Mr. Rosado's request to be released back to the community to undergo further drug treatment. The Court contemplated the 18 U.S.C. § 3355(a) factors, weighing the Defendant's need for mental health treatment, with his repeated and flagrant violations of supervised release despite the leniency shown by the Court on multiple prior occasions. [Revocation Hr'g Audio. at 36:36-38:19]. The Court found that Mr. Rosado would continue to violate the law and endanger himself and his community if left to his own devices. *Id.* at 38:20-40:00. The Court deemed that a sentence of 15 months imprisonment to be followed by a 21-month term of supervised release was sufficient but not greater than necessary to achieve the purposes of sentencing. *Id.* at 40:02-48:52.

5

## II.   Defendant's motion for compassionate release

Mr. Rosado now moves for re-sentencing pursuant to the statutory exception for "extraordinary and compelling reasons," referred to as compassionate release. 18 U.S.C. § 3582(c)(1)(A). On or around November 19, 2020, Mr. Rosado submitted a request to the warden of FCI McKean requesting that the Bureau of Prisons ("BOP") file a motion for compassionate release on his behalf. *See* [Dkt. 102-1, Def. Ex. A. (Warden Trate Resp. Ltr.)]. Warden Trate denied Mr. Rosado's request, citing the BOP's policy for medical eligibility for compassionate release. *Id.* Mr. Rosado then sought judicial relief under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act.

Mr. Rosado is 26 years old. His medical records show that he tested positive for COVID-19 on September 24, 2020. [Dkt. 102-2, (Sealed Med. R.) at 29 (09/24/2020 COVID-19 test note)]. A medical record dated a week later indicates that he did not have a fever and states he: "denies shortness of breath, chest congestion, cough, sore throat, chills, body aches, loss of taste or smell, stuffy/runny nose, and headache at this time." *Id.* at 60 (Vitals Chart, 08/29/2020-01/12/2021).  The medical records evident that Mr. Rosado has been tested for COVID-19 regularly since August 2020, including on several occasions after he contracted and recovered from the virus. *See, e.g. id.* at 2 (01/11/2021), 71 (referring to tests results from 12/17/2000, 12/07/2020 and 10/21/2020).  Although he tested positive for the virus, there are no medical records reflecting that his case was severe, or even symptomatic.

The medical records confirm that Mr. Rosado is diagnosed with asthma and

obesity. *Id.* at 71 (Health Problem List). As to Mr. Rosado's asthma, his treating physician remarked:

> 26 year old male, newly arrived, has completed quarantine protocols. Patient has history of asthma, and states that he has been using his albuterol more often than usual. Does not feel that his medication is NOT working - it does - but he has not needed daily use until about 6 months ago. States the "attack" is not worse. Just noticed daily need of medication. *Id.* at 14 (11/20/2020 Med. Note)(caps in original).

While the medical records reflect that Mr. Rosado is obese, there are no other remarks concerning any complications as a result of his weight. The BOP classified Mr. Rosado as requiring CARE Level 1, which is the lowest classification for the intensity of an inmate's medical needs in the BOP system. Dkt. 102-3 (Summary Reentry Plan) at 2]. *See Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Fed. Bureau of Prisons, at 4 https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (updated May 2019)("Care Level 1 inmates are less than 70 years of age and are generally healthy. They may have limited medical needs that can be easily managed by clinician evaluations every 6–12 months.")

Mr. Rosado also filed a copy of his institutional disciplinary and transfer records as required by the Court's standing order. [Dkt. 102-3]. According to the disciplinary report, Mr. Rosado received a prison infraction on November 16, 2020 for interfering with a security device. *Id.* at 5. In response to the asserted violation of prison regulations, Mr. Rosado did not deny the violation, instead he justified or negated the relevance of the behavior, reportedly stating he needed more toilet paper and, "I go home in February." *Id.* However, as a result of the infraction, Mr.

7

Rosado lost 27 days of good time credit.

A review of the BOP's Inmate Locator confirms that Mr. Rosado is designated to FCI McKean. *See Inmate Locator Service, BOP Registration no. 22342-014*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (Feb. 5, 2021). According to the BOP's Inmate Locator service, his current release date is March 13, 2021.

If released, Mr. Rosado proposes to live with his mother and work at his father's trucking company. [Dkt. 102 (Def. Mem. in Supp.) at 12]. Mr. Rosado's mother would provide him with a six-week grace period before charging him rent. *Id.*

## Discussion

A. <u>Legal Standard</u>

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute codifying the rule of finality states:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The specific provision under which Defendant seeks relief from his sentence, the First Step Act of 2018 (as amended), imposes procedural prerequisites to filing a motion for resentencing to provide compassionate release. First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)). Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed. *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020). The First Step Act amendments were intended to address past inaction by the BOP by removing the BOP as the sole arbiter of compassionate release, while still permitting the BOP to weigh-in on a defendant's request via the statute's exhaustion of administrative remedies requirement. See *id.* at 232; *see also United States v. Gamble*, No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020)(explaining the policy purpose behind the exhaustion requirement in this context).

Recently, in *Brooker*, the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release. 976 F. 3d at 234-36. In short, the statute only requires courts to consider "applicable" statements issued by the U.S. Sentencing Commission and the relevant policy statement, U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP. *Id.* at 235-36. In other

9

words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release." *Id.* at 236. Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id.* at 237. Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020). The district courts have broad discretion in deciding whether to grant or deny a motion for compassionate release. *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020); *see also* § 3582(c)(1)(A) ("[T]he court…may reduce the term of imprisonment...").

B. <u>Whether Mr. Rosado exhausted administrative remedies</u>

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must either "…fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf <u>or</u> the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." (emphasis added). Thus, a defendant need not exhaust all available administrative appeals of the warden's denial of the request, so long as defendant waits thirty

days before seeking judicial relief.

Here, the parties and the Court agree that Defendant exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A), as over thirty days have passed between the warden's receipt of the Defendant's request and the filing of his motion. See [Dkt. 105 (Gov. Mem. in Opp'n) at 5]. Mr. Rosado established that he first requested that the BOP move for compassionate release in November 2020, as memorialized by the warden's December 2020 response. [Dkt. 102-A (Warden Trate Resp. Ltr.)]. The BOP has had the opportunity to consider the factual basis for Defendant's requested sentence reduction, which is now properly before the Court.

C. <u>Whether "extraordinary and compelling reasons" exist to warrant a sentence reduction</u>

Section 3582(c)(1)(A) does not define what constitutes "extraordinary and compelling reasons" and, under *Brooker*, district courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F.3d at 237.

This Court and others have held that prevention from infection for an inmate with an especially heightened risk of infection and risk of developing severe complications from COVID-19 based on their specific medical history may constitute "extraordinary and compelling" reasons to grant compassionate release, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting consent motion for compassionate release where defendant suffers from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United*

11

States v. Miller, No. 3:15-CR-132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020)(granting consent motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, No. 3:13-CR-71-1 (VLB), 2020 WL 3186539, at *4-5 (D. Conn. June 15, 2020); *see also, e.g., United States v. Adams*, No. 3:16-CR-86-VLB, 2020 WL 3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020). In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. S2 18 CR. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)(citations omitted).

However, this Court and others have declined to find "extraordinary and compelling circumstances" in cases where a defendant has already contracted and recovered from COVID-19. *United States v. Saunders*, No. 3:19-CR-00167 (VLB), 2020 WL 6507389, at *7 (D. Conn. Nov. 5, 2020) ("…[he] has already demonstrated that the COVID-19 virus is not lethal for him, as he successfully weathered a previous infection. Mr. Saunders has also put forward no evidence that he will or

is likely to contract the virus again, or if he did that his condition would be worse now than it was when he contracted the virus previously."); *United States v. Gil-Grande*, No. 3:16-CR-19 (VAB), 2020 WL 5868339, at *4 (D. Conn. Oct. 2, 2020)(surveying cases); *United States v. Santiago*, No. 92-CR-563 (BMC), 2020 WL 4926470, at *2 (E.D.N.Y. Aug. 21, 2020)("I do not believe that a positive COVID-19 test, even in an individual with risk factors for severe complications or death, constitutes an extraordinary and compelling circumstance in and of itself."); *see also United States v. Adams*, No. 10-CR-82 (RJS), 2020 WL 4505621, at *3 (S.D.N.Y. Aug. 4, 2020)(Sullivan, J sitting by designation)(declining to find that "extraordinary and compelling" reasons exist because the long-term adverse effects of the virus on the offender were speculative); *United States v. Davis*, No. 12-CR-712 (SHS), 2020 WL 3790562, at *3 (S.D.N.Y. July 7, 2020).

Mr. Rosado cites an article about a twenty-five-year-old Nevada man who contracted COVID-19 twice and was hospitalized to support that Mr. Rosado is vulnerable to reinfection and that the case would be severe. [Dkt. 102 (Def. Mem. in Supp. at 9-10)]. The single case that Mr. Rosado cites does not suggest and the news article does not profess that this phenomenon is likely to be widespread among the millions of Americans who have already become infected by the virus. The October 2020 BBC article that Mr. Rosado cites admits that "[s]o far, reinfection seems to be rare - there have been only a few examples out of more than 37 million confirmed cases. Reports in Hong Kong, Belgium and the Netherlands said they were no more serious than the first. One in Ecuador mirrored the US case in being more severe but did not need hospital treatment." James Gallagher, *Covid*

13

*reinfection: Man gets Covid twice and second hit 'more severe,'* BBC News, Oct. 12, 2020, https://www.bbc.com/news/health-54512034. Based on information from the CDC, cases of re-infection from COVID-19 have been reported but remain rare. *Reinfection with COVID-19*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last updated Oct. 27, 2020).

Mr. Rosado has at least one medical condition that the CDC has identified as elevating an individual's risk of a poor prognosis from COVID-19, however, he appears in overall good health. Mr. Rosado has not put forward evidence to show that he will or is likely to contract the virus again, particularly during the next few weeks while he remains in custody, or if he did that his condition would be worse now than it was when he contracted the virus previously. While the Court appreciates the scientific uncertainty, the speculative nature of his asserted risk of re-infection is inconsistent with the purposes of 18 U.S.C. § 3582(c)(1)(A) to provide a narrow exception to the finality of a sentence once imposed. *See Davis*, 2020 WL 3790562, at *3 (citing *Freeman*, 564 U.S. at 526).

The records show that medical staff continues to closely monitor Mr. Rosado's health, including providing additional COVID-19 testing after he recovered from the virus to monitor him for the possibility of re-infection. He asserts a broad Eighth Amendment argument but presents no evidence to suggest that he has been denied access to medical treatment or that the medical treatment he received is objectively deficient. *Compare to United States v. Beck*, 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019)("Ms. Beck has invasive breast cancer and has received grossly

inadequate treatment for her condition while serving her sentence in BoP custody. During the lengthy delays, her cancer spread to her lymph nodes. Absent judicial oversight, she is unlikely to receive better treatment at FCI Aliceville going forward. She is in urgent need of appropriate treatment to prevent the further spread of her disease and the potential loss of her life. These are "extraordinary and compelling reasons" to reduce her sentence under § 3582(c)(1)(A)(i).").

Additionally, Mr. Rosado has not established any need for convalescence outside of a correctional institution, such that he is now debilitated because of the virus.

Even if the Court were to conclude that Mr. Rosado carried his burden of establishing "extraordinary and compelling" reasons for release, consideration of the 18 U.S.C. § 3553(a) sentencing factors would militate against modification of his sentence.

### § 3553(a) sentencing factors

Because the Court concludes that Mr. Rosado did not carry his burden of establishing "extraordinary and compelling" reasons to modify his sentence, the Court will only briefly discuss why the § 3553(a) sentencing factors further counsel against granting Mr. Rosado's motion for compassionate release. The Court's balancing of the § 3553(a) sentencing factors remains unchanged since sentencing, which also occurred during the pandemic.

First, the sentence in this matter reflected the pressing need to deter Mr. Rosado from committing further crimes and the need to promote respect for the law. The Court demonstrated its leniency with Mr. Rosado at his initial sentencing,

15

where he potentially faced 20 years of incarceration for an odious crime. Rather than making the most of his second chance, he chose to disregard the Court's orders and admonition that there would not be a third chance. Mr. Rosado was provided access to therapeutic resources and much-needed structure from his supervising Probation Officer but elected to disregard these tools. His behavior escalated from drug use to drug dealing, resulting in an issuance of a warrant for his arrest after he fled.

Even after a second period of incarceration, Mr. Rosado still fails to conform his behavior to what is required of him. Mr. Rosado committed a recent disciplinary infraction resulting in the forfeiture of nearly a month of good time credit. If the Court were to order Mr. Rosado's release now, he would effectively negate the sanction he received. This provides further support that the Court's view of the Defendant's personal characteristics from sentencing remains applicable. The defendant needs to be deterred and he needs to have impressed upon him the fact that the law is not a suggestion or an invitation. It is a serious mandate, and a violation of the law has serious consequences. The defendant's conduct, both past and his most recent conduct, indicates that he is a serious risk of harm to the community, and continues to be.

Although the institutional records show that Mr. Rosado has recently engaged in some available educational and drug-treatment programing, he has not done so to a degree consistent to overcome his consistent pattern of disrespect for the law.

Under these circumstances and after considering each of the § 3553(a) factors, the Court cannot conclude that the remaining portion of his custodial

sentence is futile, despite the very limited duration remaining. Therefore, even if extraordinary and compelling reasons for a sentence modification existed, there is no sentence modification that would comport with the purpose of sentencing as set forth in § 3553(a).

## Conclusion

For the above stated reasons, the Court DENIES Mr. Rosado's motion for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: February 8, 2021